**UNITED STATES, Appellee,**

v.

**Jose DE JESUS–RIOS, a/k/a Papo Rios, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Eva RIOS, Defendant, Appellant.**

**Nos. 91–1860, 91–1933.**

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1993.

Decided April 7, 1993.

Gabriel Hernandez Rivera for defendant, appellant Jose De Jesus–Rios.

Juan Acevedo–Cruz with whom Wilma E. Reveron–Collazo was on brief, for defendant, appellant Eva Rios.

Jose A. Quiles Espinosa, Sr. Litigation Counsel, with whom Daniel F. Lopez Romo, U.S. Atty., and Antonio R. Bazan, Asst. U.S. Atty., were on brief, for appellee.

Before STAHL, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

STAHL, Circuit Judge.

Appellants Jose de Jesus Rios ("Jose Rios") and his cousin, Eva Maria Rios ("Eva Rios"), were convicted of aiding and abetting each other in the importation of approximately 196 kilograms of cocaine into the customs territory of the United States in violation of 18 U.S.C. § 2 and 21 U.S.C. § 952(a). Appellants also were convicted of aiding and abetting each other in the possession with intent to distribute cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). On appeal, both maintain that the evidence was insufficient to support their respective convictions. Eva Rios also argues that the district court erred in denying her motion to suppress the pretrial identifications of her by two government witnesses. After careful consideration of the record, we affirm the conviction of Jose Rios and vacate that of Eva Rios.

## I.

### *Factual Background*

The two principal government witnesses, George Rivera Antron ("Rivera") and Juan

Enrique Mejias Valle ("Mejias"), brothers-in-law who had known each other more than thirty years, worked together aboard a vessel named the "Santa Martina." The Santa Martina, which was owned by Rivera, transported general cargo between the islands of Puerto Rico and St. Thomas. Rivera made his livelihood as the captain of the Santa Martina, and Mejias was employed as his assistant.

On February 7, 1991, at approximately 5:30 p.m., while Mejias was working on the Santa Martina, which was docked at a port in St. Thomas, two women approached him looking for Rivera. Mejias informed them that Rivera was on an errand and would probably return around 6:00 p.m. The two women waited for Rivera for approximately fifteen minutes, during which time they engaged Mejias in casual conversation. For reasons unexplained in the record, they departed before Rivera returned to the boat.

The following morning, at approximately 8:00 a.m., one of the two women returned to the boat looking for Rivera. Mejias, who was preparing the boat for departure, informed her that Rivera was on an errand and would return shortly. A few minutes later Rivera returned, and the woman, posing as a commercial dealer in detergent, asked him to transport ten boxes of detergent to Fajardo, Puerto Rico. Rivera agreed and they made the necessary arrangements. When Rivera asked what name should be entered on the receipt as "sender," the woman responded "A & A Supplies." When asked what name to enter as receiver, she responded "Papo Rios." At some point during their conversation, the woman told Rivera that she would "send the boxes later." The conversation between Rivera and the woman, which was witnessed by Mejias, lasted somewhere between five and fifteen minutes.

Approximately one-half hour after she left, two men drove up to the dock in a truck with the ten boxes. One of the men told Rivera that "the lady sent the boxes."

About an hour after the ten boxes were loaded onto the Santa Martina, Rivera and Mejias departed St. Thomas for Fajardo, Puerto Rico.

The Santa Martina arrived in Fajardo later that afternoon. After docking the vessel, Rivera went to customs to enter all of his cargo. On the way to customs, Rivera was approached by Jose Rios, who—as it turned out—had been a long-time acquaintance of Rivera's. Rivera knew Jose Rios as "Papo Rios." Rivera asked Jose Rios to accompany him to customs to sign for the ten boxes being delivered to him. On the way to customs, Jose Rios disclaimed ownership of the boxes, and told Rivera that he did not know why the boxes had been sent to him. At customs, however, Jose Rios signed the entry declaration as the "owner" of the ten boxes. Rafael Figueroa, a United States customs agent who witnessed Jose Rios sign the declaration, testified that Jose Rios appeared "nervous" as he answered questions about his ownership of the ten boxes.

After all of the relevant customs documents were processed, Rivera, Jose Rios, and United States Customs Agent Angel Luis Villegas Lopez ("Agent Villegas"), went to the Santa Martina to unload its cargo. As Jose Rios was carrying one of the boxes off the boat, Agent Villegas became suspicious about its weight and decided to inspect it. Agent Villegas opened one of the boxes and discovered powder that appeared to be cocaine. Upon hearing that cocaine may have been discovered, Jose Rios disclaimed ownership of the boxes, stated that he was "going to look for the owners," and promptly departed the scene.

Shortly thereafter, Agent Villegas conducted a field test on the powder in one of the boxes. That test yielded a positive result for cocaine.[1] The government then seized the Santa Martina, informing Rivera that it would be held pending the investigation. Several days later, the government arrested Jose Rios, and began its search for the as yet unidentified woman who had

---

1. A subsequent field test and laboratory analysis of the powder in the ten boxes confirmed that it was cocaine. A government witness testified that the cocaine had a "street value" of as much as 40 million dollars.

contracted with Rivera to ship the ten boxes to Fajardo. The facts leading up to the identification of Eva Rios as that person are summarized below.[2]

On February 8, 1991, both Rivera and Mejias gave verbal descriptions of the woman who had contracted with Rivera to United States Customs Agent Hector Marti Figueroa ("Agent Marti"). According to Agent Marti, both Rivera and Mejias described the woman as a "Latin female" with "dark hair" and "white" skin who was "a little chubby" and approximately five feet, two inches tall.

On February 11, 1991, Rivera was interviewed again by United States Customs Agent Juan Dania ("Agent Dania"), and Agent Marti. Relying upon written notes, Agent Dania testified that Rivera described her as "white" with "shoulder length [black] hair" and "a full face ... with fine features."[3] The next day, on February 12, Agents Dania and Marti also interviewed Mejias. Relying upon his written notes, Agent Dania testified that Mejias described the woman as "white."

Although the record is not clear, it appears that Eva Rios became a suspect based upon independent information from a confidential informant. Apparently relying upon that information, Agents Marti and Dania decided to conduct a show-up identification procedure using Rivera as the identifying witness and Eva Rios as the potential suspect. To that end, on February 16, 1991, they arranged with Eva Rios to meet them in front of the United States Customs Building in St. Thomas. Immediately after making the arrangements with Eva Rios, Agent Marti phoned Rivera and instructed him to be at the United States Customs Building by 11:30 a.m.

Upon Rivera's arrival, Agent Marti informed him that a suspect, named "Eva Rios," would be meeting the agents on the steps of the customs building sometime between 11:30 a.m. and 12:00 p.m. Marti also informed Rivera that the purpose of Eva Rios's visit was to allow him to make an identification of her. Rivera was instructed to sit in a parked car across the street from the customs building, and to signal the agents with a white handkerchief as soon as he could positively identify her as the woman with whom he spoke on the morning of February 8, 1991.

At some point between 11:30 a.m. and 12:00 p.m., Eva Rios arrived at the customs building. Rivera testified that he saw her as she drove by, as she parked her car, and again as she walked by his parked car. He did not, however, give a signal to the officers until she walked up to Agents Marti and Dania, shook their hands, and sat down next to them on the stairs of the customs building. Based upon Rivera's positive identification of Eva Rios, Agents Marti and Dania arrested her on the spot.

The record reveals that February 16, 1991, was a Saturday, Eva Rios's car was the only car that drove by the customs

---

**2.** In reviewing the denial of a motion to suppress, our review is not limited to the transcript of the suppression hearing where, as here, the defendant renewed her motion at trial. *See United States v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir.) (holding that appellate review of denial of motion to suppress may include evidence adduced at trial only in cases where defendant renews the motion at trial), *cert. denied*, 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). *See also* 4 Wayne R. LaFave, *Search & Seizure* § 11.7(c), at 519 (2d ed. 1987) ("If following [her] conviction the defendant takes an appeal and claims that [her] motion to suppress was erroneously denied, ... the appellate court [must] consider *trial* evidence favorable to ... the defendant ... where the pretrial motion is renewed and reconsidered by the trial judge during the course of trial.") (emphasis in original). *Cf. United States v. Vargas*, 633 F.2d 891, 895 n. 6 (1st Cir.1980) ("the use of trial testimony to *undermine* the validity of an arrest or search is apparently discouraged, at least when the motion to suppress has not been renewed and reconsidered during the course of the trial") (emphasis in original).

**3.** At the suppression hearing, Rivera admitted that he described the suspect to Agent Dania as "white." At trial, however, Rivera testified that he used the phrase "blanca-attrigenado," which—according to the English translations offered by both the government and defense attorneys—is apparently equivalent to describing someone as a "light-skinned black person." Although a description of Eva Rios's actual skin color does not appear anywhere in the record, it is apparent from the government's and defense counsel's briefs that the phrase "blanca-attrigenado" accurately describes her skin color.

building during the time Rivera was in his parked car, and, while several women "passed by" the customs building during that time, only Eva Rios stopped to talk with the agents. Agents Marti and Dania also testified that they would not have arrested Eva Rios but for Rivera's positive identification of her. Subsequently, on or about February 22, 1991, the government returned the Santa Martina to Rivera.

On February 25, 1991, Rivera and Mejias were brought to an office in the customs building and shown a photo-spread of six photographs, one of which was Eva Rios. Both Rivera and Mejias positively identified Eva Rios from the photo spread. After Rivera and Mejias made their respective identifications, Agent Marti, the agent in charge of the procedure, asked both of them to sign affidavits attesting to the results. They also included in their affidavits an additional description of the woman with whom they spoke on February 8. Rivera described her as "a young woman ... with dark hair, light brown complexion, thirty years old ... and somewhat fat." Mejias described her as a lady "with light brown skin, of average height ... dark hair and a little fat."

Agent Marti testified that Rivera and Mejias made their identifications at different times and "never encountered each other at the office." [4] When asked whether he had had any discussions with Rivera about the incident, Mejias testified that he ended his employment relationship with Rivera on February 8, 1991, and had not seen Rivera between that date and February 25, 1991, the date of the photo spread identification. During their trial testimony, Rivera and Mejias also made in-court identifications of Eva Rios as the woman with whom they spoke on February 8, 1991.

At trial, both defendants took the stand in their own defense. Jose Rios testified that he had been asked by his cousin, Evaristo Rios (Eva Rios's brother), to pick up the boxes on board the Santa Martina. He denied any knowledge that the boxes contained cocaine, and claimed not to have spoken with Eva Rios for seven or eight years. When asked why he signed the customs document as the "owner" of the ten boxes, he stated that he did so in order to pick up the boxes for his cousin.

As well as arguing that she had been misidentified by Rivera and Mejias, Eva Rios presented an alibi defense. Essentially, her alibi witnesses testified that she could not have been on the St. Thomas waterfront at the time in question. One witness, who worked at the school Eva Rios's daughter attends, remembered Eva Rios dropping off her daughter at the school at around 7:30 a.m., on February 8, 1991. An employee at Eva Rios's place of employment testified that Eva Rios was at work on February 8, 1991, and usually arrived at work between 8:00–8:10 a.m. A traffic officer in St. Thomas further testified that, based on the common traffic conditions in St. Thomas, Eva Rios would not have been able to travel from her daughter's school to the waterfront and then to her office between 7:30 a.m. and 8:10 a.m.

On April 30, 1991, the jury found Jose and Eva Rios guilty on both counts. Jose Rios was sentenced to 210 months, and Eva Rios to 188 months, of imprisonment. These appeals followed.

## II.

### Discussion

#### A. The Admissibility of the Pretrial Identifications of Eva Rios

Eva Rios's principal contention on appeal is that Rivera's February 16, 1991, pretrial identification of her was the result of a highly suggestive, prejudicial, and unlawful showup procedure, the introduction of which violated her due process rights. She also argues that Rivera's February 25, 1991, and his in-court identifications were tainted by the previous identification, and

---

4. Agent Marti's testimony on this question was, however, contradicted by Mejias, who testified during the suppression hearing that, on February 25, he and Rivera were at the office at the same time but went into the office to make their identifications separately. Mejias testified that, while he waited in the hall to be called into the office, he saw Rivera walk into and out of the office.

should, therefore, also have been kept from the jury.[5]

■ We will uphold a district court's denial of a motion to suppress if any reasonable view of the evidence supports it. *See, e.g., United States v. McLaughlin,* 957 F.2d 12, 16 (1st Cir.1992). Moreover, the findings of the district court after a hearing on a pretrial motion to suppress are binding on appeal unless they are clearly erroneous. *See, e.g., id.* at 17.

■ To determine whether evidence procured as a result of a pretrial identification procedure should be excluded, a district court must conduct a two-pronged inquiry. *See, e.g., Allen v. Massachusetts,* 926 F.2d 74, 81 (1st Cir.1991); *United States v. Maguire,* 918 F.2d 254, 263 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2861, 115 L.Ed.2d 1027 (1991); *United States v. Bouthot,* 878 F.2d 1506, 1514 (1st Cir.1989). First, the court must determine whether the procedure was impermissibly suggestive. *See, e.g., Maguire,* 918 F.2d at 263. If the court finds the procedure impermissibly suggestive, it must then inquire whether, under the totality of circumstances, the identification itself was reliable, despite the suggestive procedure. *See, e.g., Allen,* 926 F.2d at 81. The factors to consider under the reliability prong are fivefold:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*Id.* (quoting *United States v. Drougas,* 748 F.2d 8, 27 (1st Cir.1984)) (citing *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972)).

■ Before excluding identification evidence, the court must be persuaded that there was " 'a very substantial likelihood of irreparable misidentification.' " *Bouthot,* 878 F.2d at 1514 (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). A court must also be mindful that " 'it is only in extraordinary cases that identification evidence should be withheld from the jury.' " *Maguire,* 918 F.2d at 264 (quoting *United States v. Turner,* 892 F.2d 11, 14 (1st Cir. 1989)). *See also Bouthot,* 878 F.2d at 1516 n. 11.

In applying the first prong of this test, the district court concluded that the one person showup identification procedure was impermissibly suggestive. *See De Jesus Rios,* slip op. at 2 ("The agents in this case were ... oblivious to the almost uniform criticism of show up in their use of this unfair and discredited method of investigation.") (internal quotations and citation omitted) (" 'The practice of showing suspects singly to persons for the purpose of identification[,] and not as part of a [lineup,] has been widely condemned.' ") (quoting *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). Applying the second prong of the test, however, the district court concluded—from the totality of the circumstances—that Rivera's identification was nevertheless reliable. *See De Jesus Rios,* slip op. at 4 (finding "no significant difference between the descriptions [Rivera] gave before and after the [showup]"). As a result, the court denied Eva Rios's motion to suppress that evidence. *See id.* at 2–4.

■ After a close review of the record, we agree with the district court's conclusion that the showup procedure was impermissibly suggestive but disagree with its determination that Rivera's identification was otherwise reliable. While application of the first, second, and fifth factors enumerated above does not give us pause,[6] we

---

5. Additionally, Eva Rios argues that the February 25, 1991, photo spread identification procedure was irregularly administered and, therefore, rendered Mejias's independent identification of her inadmissible as well. For the reasons amply addressed in the district court's opinion, *see United States v. De Jesus Rios,* No. 91–0084CCC, slip op. at 4–5 (D.P.R. April 23, 1991), we find this argument meritless, and see no need to address it further.

6. It is clear from the record that Rivera had ample time (at least five minutes) to view the

are troubled by application of the third and fourth factors (*i.e.*, the accuracy of the witness's prior description of the criminal, and the level of certainty that witness demonstrated at the confrontation) to the facts of this case. Agent Marti testified that, on the date the cocaine was discovered, February 8, 1991, Rivera described the suspect as "white" and approximately five feet, two inches tall. Rivera's testimony at the suppression hearing and Agent Dania's trial testimony revealed that during his February 11, 1991, interview with Agent Dania, Rivera again described her as "white." It was not until after the February 16, 1991, showup that Rivera described the suspect as having "light brown" skin.[7] Moreover, Rivera also failed to provide an accurate description of her height (five feet, six inches) at either of his pre-showup descriptions.[8]

The record also contains uncontroverted evidence that, despite having been asked at the February 16, 1991, showup to signal the agents when he positively identified Eva Rios, Rivera waited until after she approached the agents and began speaking with them (as scheduled) to signal. We hardly think that this constitutes a high degree of certainty on Rivera's part, particularly in light of the showup procedure at issue here. Prior to that showup, Rivera was informed that the agents were meeting the suspect in front of the customs building at a specific time. While a few other women also may have walked by the customs building that morning, *only* Eva Rios stopped to speak with the agents.[9]

Based upon the above analysis, therefore, we find that Rivera's pretrial identifications were both impermissibly suggestive and unreliable. And, as this is not a case of *"minimal* suggestivity ... [that could have been] cured at trial," *Maguire*, 918 F.2d at 264 (emphasis supplied), we conclude that his identification testimony should have been kept from the jury.

Our inquiry does not, however, end here. We must now determine whether the district court's error was "harmless beyond a reasonable doubt." *Arizona v. Fulminante*, —— U.S. ——, ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Outside of Rivera's testimony, the only other evidence linking Eva Rios to the crime was the testimony of Mejias, Rivera's brother-in-law and former employee. Mejias testified that he spoke with the suspect for approximately fifteen minutes on February 7, 1991, the day before the crime. He spoke with her again the next morning when she inquired about Rivera's whereabouts, and witnessed the subsequent conversation between her and Rivera. He gave descriptions of her on February 8, 12, 25, and during his trial testimony. Despite having described her skin color as "white" on both February 8 and 12, he selected her picture on February 25, from a photo spread with photos of five other women with similar characteristics. Also on that date, he described her as having "light brown skin." Additionally, during his trial testimony, he identified her in court as the woman he spoke with on February 7 and 8.

---

suspect on the date the arrangements were made to ship the purported detergent, that he paid some degree of attention to the person at the time, and that eight days between the date of the cocaine shipment and the showup was not unreasonable.

**7.** Accordingly, the district court's finding that there was "no significant difference" between Rivera's pre-showup and post-showup descriptions of the suspect is clearly erroneous.

**8.** During the suppression hearing, Agent Marti—who is approximately five feet, seven inches tall—testified that, on February 8, 1991, Rivera described the suspect as being "a little bit more or less like my [Agent Marti] height." At trial,

however, he admitted that, on February 8, 1991, Rivera described the suspect as five feet, two inches tall.

**9.** Our analysis of the reliability of Rivera's identification is further informed by the undisputed evidence that the government seized Rivera's boat, his only source of livelihood, on the date of the crime, and informed him that he would receive it only after their investigation was completed. The record also reveals that the government returned his boat less than a week after his positive identification of Eva Rios. We think that these facts, when placed alongside the one-person showup and Rivera's belated identification, cast *serious* further doubt on the reliability of that identification.

■ Although the harmless error question is close, we cannot conclude—under the particular circumstances of this case—that the error was harmless beyond a reasonable doubt. First, there is no way for us to discern the role that Rivera's identification played in the jury's deliberations. We are concerned that the jury may have been persuaded to convict by the very fact that there were *two* witnesses who identified Eva Rios. It is also possible that the jury relied solely upon the testimony of Rivera in reaching its conclusion. Thus, we find reasonable doubt exists as to whether the jury would have convicted Eva Rios based solely upon Mejias's identification testimony.[10] *See Clark v. Moran*, 942 F.2d 24, 27 (1st Cir.1991) ("there must be 'no reasonable doubt' that the jury would have reached the same verdict without having received the tainted evidence") (quoting *Milton v. Wainwright*, 407 U.S. 371, 377, 92 S.Ct. 2174, 2178, 33 L.Ed.2d 1 (1972)). *Cf. Coppola v. Powell*, 878 F.2d 1562, 1571 (1st Cir.) (holding no harmless error where improperly admitted evidence "may have been the clincher" in the jury's deliberations), *cert. denied*, 493 U.S. 969, 110 S.Ct. 418, 107 L.Ed.2d 383 (1989).

Finally, this is not a case of "overwhelming evidence of guilt." *Wainwright*, 407 U.S. at 377, 92 S.Ct. at 2178; *Moran*, 942 F.2d at 27. Indeed, the entire case against Eva Rios depended upon the jury's having credited the Rivera and Mejias identifica-

tions and rejected her alibi defense.[11] Under these circumstances, we cannot say that the district court's error was harmless *beyond a reasonable doubt. Cf. Coppola*, 878 F.2d at 1571 (holding no harmless error despite finding that independent evidence indicated it was "probable that [defendant] committed the crime"). Accordingly, Eva Rios's conviction cannot stand.[12]

## B. Sufficiency of the Evidence Against Jose Rios

Jose Rios asserts that there was insufficient evidence to find him guilty of aiding and abetting in the violation of 21 U.S.C. § 952(a)[13] (importation of cocaine), and 21 U.S.C. § 841(a)(1)[14] (possession with intent to distribute cocaine). As such, he argues that the district court erroneously denied his Rule 29(a) motions for judgment of acquittal.

■ "In reviewing a properly preserved Rule 29 motion, we examine the evidence and all legitimate inferences therefrom in the light most favorable to the government to determine whether a rational jury *could* have found guilt beyond a reasonable doubt." *United States v. Morales–Cartagena*, 987 F.2d 849, 850 (1st Cir.1993) (emphasis added). *See also United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993) (To uphold a conviction, the court must "satisfy itself that the guilty verdict finds support in 'a plausible rendition of the rec-

---

**10.** We note that there exists at least some basis for questioning Mejias's testimony that his photo-spread and in-court identifications of Eva Rios were not influenced by Rivera's showup identification. Mejias and Rivera were brothers-in-law of more than thirty years who worked together on Rivera's boat. Despite their close relationship, Mejias testified that he had no contact with Rivera between February 8, 1991, (the date on which he and Rivera described the suspect as having "white" skin), and February 25, 1991, (the date on which they both described the suspect as having "light brown" skin and selected Eva Rios's picture from a photo-spread). This testimony, coupled with the fact that Mejias offered no explanation as to what caused him to change his description of the suspect, may well have led the jury to doubt his credibility on this critical question.

**11.** Our harmless error analysis might be different had the government's case against Eva Rios

included the testimony of the confidential informant, the two men who delivered the ten boxes of purported detergent to the boat, an eyewitness who was not a potential suspect in the case, or some physical evidence linking her to the crime.

**12.** We need not address, therefore, Eva Rios's alternative argument that the evidence was insufficient to convict her.

**13.** 21 U.S.C. § 952(a) provides that it "shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States) ... [a] controlled substance...."

**14.** 21 U.S.C. § 841(a)(1) provides that it "shall be unlawful for any person knowingly or intentionally" to "possess with intent ... to distribute ... a controlled substance...."

ord.'") (quoting *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993)). In making this determination, the court must resolve all credibility issues in favor of the verdict. *United States v. Nueva,* 979 F.2d 880, 883 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1615, 123 L.Ed.2d 175 (1993).

To prove a violation of 21 U.S.C. § 952(a), the government must show beyond a reasonable doubt that a defendant knowingly or intentionally imported, or caused to be imported, a controlled substance into the customs territory of the United States. *See United States v. Alvarado,* 982 F.2d 659, 663 (1st Cir.1992). *See also United States v. Ocampo–Guarin,* 968 F.2d 1406, 1409 n. 2 (1st Cir.1992) ("This statute 'requires little else but a showing that a defendant has knowingly brought a controlled substance with him from abroad into the United States.'") (quoting *United States v. McKenzie,* 818 F.2d 115, 118 (1st Cir.1987)). "Criminal intent may, of course, be inferred from circumstantial evidence." *Morales–Cartagena,* at 852.

■ To prove a violation of 21 U.S.C. § 841(a)(1), the government must show beyond a reasonable doubt that a defendant knowingly or intentionally possessed a controlled substance with intent to distribute it. *United States v. Gomez–Villamizar,* 981 F.2d 621, 624 (1st Cir.1992). A defendant can be found guilty under this statute if s/he merely has constructive possession of the controlled substance. *Id.* The quantity of drugs involved is sufficient to create an inference that a defendant knew that it would be distributed. *Id. See also United States v. Vargas,* 945 F.2d 426, 428–29 (1st Cir.1991) (holding that possession of one kilogram of cocaine is enough to support inference of intent to distribute).

■ Jose Rios argues that the evidence was insufficient because (1) the government failed to prove that he made any contacts with the person who sent the cocaine prior to its shipment, and (2) the only evidence linking Jose Rios to the crime was his presence at the dock in Fajardo. Un-fortunately for appellant, these arguments fall well short of the mark.

Evidence in the record supports an inference that Jose Rios did have contact with the sender prior to the shipment. For instance, the sender instructed Rivera to fill in the name of "Papo Rios" on the receipt as the individual who would receive the shipment. Testimony revealed that Jose Rios also went by the name of "Papo Rios." And, Jose Rios was the individual who greeted Rivera on the dock in Fajardo to pick up the ten boxes. Further, despite having disclaimed ownership of the ten boxes, Jose Rios signed the customs document as the "owner" of the ten boxes.

Jose Rios's defense turned upon the jury believing his story about having been duped by his cousin Evaristo Rios. Unfortunately for him, it appears that the jury found his story unpersuasive. Having carefully reviewed the record, we think that there is ample evidence to support his conviction. Accordingly, we do not disturb it.

### III.

#### *Conclusion*

In sum, for the reasons herein stated, we vacate the judgment of conviction as to Eva Rios, and affirm the judgment of conviction as to Jose Rios.

**In Appeal No. 91–1933, the judgment of conviction is vacated and the case is remanded for further proceedings not inconsistent with this opinion.**

**In Appeal No. 91–1860, the judgment of conviction is affirmed.**