[NOT FOR PUBLICATION -- NOT TO BE CITED AS PRECEDENT]

# United States Court of Appeals
## For the First Circuit

---

No. 99-1509

UNITED STATES OF AMERICA,

Appellee,

v.

JAY WOODWARD,

Defendant, Appellant.

---

No. 99-1510

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK KING,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Boudin, Circuit Judge.

———————

Matthew S. Robinowitz, by Appointment of the Court, for appellant Woodward.

James P. Duggan, by Appointment of the Court, for appellant King.

Donald L. Cabell, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

———————

July 25, 2000

———————

**COFFIN, <u>Senior Circuit Judge</u>.** Defendants Patrick King and Jay Woodward appeal their bank robbery convictions, arguing, <u>inter alia</u>, that witness identifications of them should have been excluded from evidence at trial and that the court erred by enhancing their sentences based on the bodily injury caused to a teller. Finding no error in the court's admission of the identifications and no merit in defendants' other contentions, we affirm.

## I. <u>Background</u>

A Fleet Bank in Peabody, Massachusetts, was robbed at gunpoint on the morning of June 23, 1998, at approximately 11:30 a.m. A few minutes later, truck driver Gary Evans observed four darkly dressed men, two of whom were transferring leather bags from one car to another, in the parking lot of a nearby restaurant.

The following facts are derived from testimony given at a hearing on Woodward's motion to suppress Evans's identification of him as one of the four men. Evans was pulling into the rear parking lot of the Hometown Buffet restaurant to make a delivery when he was cut off by a gray Oldsmobile. Evans, angered, yelled at the car's driver as the car raced around him and pulled to a stop in front of him, near a parked black Mustang BT and a red vehicle. Evans proceeded to park his truck to make

his delivery and observed two men exit the car and load leather bags from the gray Oldsmobile into the trunk of the Mustang before speeding off in the Mustang. The front seat passenger of the Oldsmobile then got out and showed Evans that he was carrying a gun before leaving the scene in the red car with the fourth individual. Evans asked restaurant employees to phone the police.

After being interviewed by local police and FBI Agent Margaret Cronin, Evans was taken by police car to Chestnut Street in Lynn to view two of the suspects. When pulling onto the street, Evans saw the red car he had seen at the restaurant, and at approximately 1:20 p.m. Evans identified Remington as he stood on the sidewalk and then King, also standing on the sidewalk with police. After making the identifications, Evans observed Remington and King being arrested and taken away in police cruisers and the red car being searched and then towed away.

Evans was then escorted, this time by Agent Cronin, to Alice Avenue. On the way to Alice Avenue, Evans was told by Cronin that police believed they had apprehended the remaining two individuals and that Evans needed to identify them if he could. The street was blocked off, multiple police cars were present, and bystanders were trying to observe the situation. Evans

observed the black Mustang before he was asked to view anyone. At approximately 2:25 p.m., Evans confirmed that Meola, who was presented in handcuffs and escorted by police officers into the middle of the street, was one of the individuals present at the Hometown Buffet. Finally, Evans identified Woodward, who was also escorted into the street in handcuffs by police.

Woodward filed a motion seeking to suppress Evans's identification of him on the ground that it was so suggestive and unreliable that its admission into evidence would violate his due process rights.[1] The district court agreed that the identification was impermissibly suggestive, but held that it was sufficiently reliable to be admitted. Woodward renews his challenge on appeal. Both appellants also challenge the court's finding that bodily injury was caused to a teller during the robbery and make various claims regarding the court's instructions to the jury and its sentencing determinations.

## II. Discussion

### A. Identification

---

[1]Although King challenges the admission of his show-up identification on appeal, he neither joined in Woodward's motion to suppress below nor presented evidence at the suppression hearing and thus has not preserved his argument. See Fed. R. Crim. P. 12(f); Campos-Orrego v. Rivera, 175 F.3d 89, 95 (1st Cir. 1999).

An out-of-court identification claimed to be constitutionally flawed is subject to a two-pronged inquiry. See United States v. De Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). The court must first consider whether the procedure was impermissibly suggestive. See id. If the court finds that the technique was improper, it must consider whether, under the totality of the circumstances, the identification itself was reliable, despite the suggestive procedure. See id.; see also Manson v. Braithwaite, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ."). Indicia of reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114 (citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)); see also De Jesus-Rios, 990 F.2d at 677. "[I]t is only in extraordinary cases that identification evidence should be withheld from the jury." United States v. Turner, 892 F.2d 11, 14 (1st Cir. 1989).

Although the admissibility of a witness identification is a mixed question of law and fact, for the purposes of argument

only, we indulge Woodward's argument that the district court's determination should be reviewed de novo. Even if we conclude that error occurred, however, the jury's judgment remains intact if a review of the entire record persuades us that the error was "'harmless beyond a reasonable doubt.'" De Jesus-Rios, 990 F.2d at 678 (citation omitted).

We are in full agreement with the district court's determination that the procedure was impermissibly suggestive. Even though Woodward was already in custody and could easily have been taken to the police station for a line-up identification, he was singled out in handcuffs to Evans, who had seen the other individuals he identified be arrested and who had been told by police that they believed they had apprehended the remaining robbers. See, e.g., Velez v. Schmer, 724 F.2d 249, 251 (1st Cir. 1984) (noting that "[a] staged show-up is presumptively more suggestive than a line-up" and concluding that a show-up was improper when the police made suggestive remarks and could have waited a short time to allow the organization of a line-up). We thus turn to the reliability prong of the analysis.

Woodward argues that inaccuracies in Evans's initial description of him render the show-up identification unreliable. When first interviewed at the Hometown Buffet, Evans described

Woodward as having a blond crew cut, although Evans apparently had long blond hair at the back of his head and the hair at the front of his head was described by Agent Cronin as brown. Woodward also emphasizes that Evans described Meola as dark-skinned, although Agent Cronin testified that she would not characterize him as such, and that Evans misidentified the make of the red car. Finally, Woodward points out that although Evans testified at the suppression hearing that four men arrived at the Hometown Buffet in the Oldsmobile and Agent Cronin confirmed that he had so stated at the scene, a Peabody police officer testified that Evans told him he saw three men exit the Oldsmobile but the fourth was waiting in the red vehicle. Woodward contends that the accuracy of the prior description is the most important factor in assessing reliability and that the discrepancies here are therefore of great significance, relying on Dispensa v. Lynaugh, 847 F.2d 211 (5th Cir. 1998).

Contrary to Woodward's argument, accuracy is given no greater emphasis than the other factors relevant to reliability. Woodward's reliance on Dispensa is misplaced because there the court held only that, based on the particular facts before it, the lack of accuracy in the witness's prior description was by far the greatest indication that the out-of-court identification was not reliable. See id. at 220 (not only did the witness

describe assailant as shorter and lighter than defendant, but also did not include "his moustache, his general hirsuteness, and the striking tattoos" in her description). Furthermore, the discrepancies in Evans's descriptions are not sufficient to taint the overall reliability of the identifications. As the district court noted, Woodward was likely wearing a hooded sweatshirt similar to those Evans specifically reported seeing on two of the other participants,[2] which would have obscured Evans's view of the length of the hair on the back of Woodward's head, which Evans correctly described as blond. In addition, despite the fact that Evans mistook the red car, which was a Dodge Stratus, for an Oldsmobile, he reported five of the six digits on its license plate, and he also correctly identified the black car as a Mustang GT. Finally, although the Peabody officer testified differently, Evans's statement that he observed four men in the gray Oldsmobile as it pulled into the parking lot was substantiated by Agent Cronin's report.

Evans's physical descriptions of the four individuals, as least as relayed at the suppression hearing, admittedly

_____

[2]At the suppression hearing, Evans testified that Woodward did have a hooded sweatshirt on, with the hood up on his head during part of the encounter, but this information was apparently not in Agent Cronin's report of Evans's original description.

contained less detail than is ideal.[3]  Nevertheless, this court

has upheld the admission of identifications even when the

original description contained minimal physical detail, see

Allen v. Massachusetts, 926 F.2d 74, 81 (1st Cir. 1991) (only

description witness apparently gave of suspect was that he was

a black man), and when a witness provided no physical

description of the suspect prior to the identification,

see United States v. Watson, 76 F.3d 4, 7 n.1 (1st Cir. 1996)

(witness provided no description of assailant but identified him

within minutes of the assault); United States v. Drougas, 748

F.2d 8, 28 (1st Cir. 1984) (witness did not provide any prior

description but was co-conspirator with suspect).  Furthermore,

we have allowed an identification when the witness's original

description contained inaccuracies.  See Gullick v. Perrin, 669

F.2d 1, 4 (1st Cir. 1981) (description was reliable even though

the victim's initial description of her assailant included a

patch of silver hair, which defendant did not have).

Moreover, other factors weigh in favor of reliability.

Although Woodward contends that the incident at the Hometown

Buffet happened very quickly, preventing Evans from having a

---

[3]At the hearing, little information was elicited from Agent
Cronin as to the "detailed descriptions" of each of the four
individuals that Evans supposedly gave her at the Hometown
Buffet.

good opportunity to observe the suspects, he admits that Evans's degree of attention was very high. Because the car in front of him was in close proximity to the four suspects, Evans had a good opportunity to observe the four men and his level of attention was heightened by their actions. Evans also was very certain about his identifications. He interrupted Agent Cronin's explanation of the show-up process to exclaim that he could identify Remington, who was standing on the sidewalk, and he testified that the moment he saw Woodward, as Woodward walked between two cars towards him, he was positive that he recognized him. Finally, the time between Evans's observation of the four men and his show-up identification of Remington and King was only about two hours and of Woodward and Meola, approximately three hours. While we do not attach great weight to this factor, two or three hours is not sufficiently extended to detract from the other factors indicating reliability. See Velez, 724 F.2d at 252 (concluding that most cases that place substantial weight on this factor involved identifications made within an hour of the crime and declining to place weight on timing when the identification occurred more than nine hours after the original observation). Thus, although Evans's description of Woodward was not completely accurate, the sum of

the reliability factors leads us to conclude that the court did not err in admitting Evans's show-up identification of Woodward.

Furthermore, even if the court did err in admitting the show-up identification, the error was harmless given the abundance of other evidence confirming Woodward's guilt. See Clark v. Moran, 942 F.2d 24, 27 (1st Cir. 1991) ("In the practical application of this standard, courts have found error to be harmless when the untainted evidence, standing alone, provided 'overwhelming evidence' of the defendant's guilt."). Cooperating defendant Meola testified that all four defendants met several times during the week before the robbery to plan it, that Woodward had helped to count the stolen funds, and that he helped to hide the money before surrendering to police. Meola's former girlfriend testified that all four defendants entered her house at the same time on June 23, 1998, and announced that they had just committed a robbery. She and Meola both testified that Woodward helped them to hide the money in a bedroom closet in the house on Alice Avenue.

B. Sentencing

Both Woodward and King contend that the court erred by increasing their base offense levels by two pursuant to U.S.S.G. § 2B3.1(b)(3)(A), based on the bodily injury sustained by a bank teller who was pushed to the ground by King during the

commission of the robbery. "Bodily injury" is defined by the guidelines as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1 cmt. 1(b). The district court's determination that bodily injury was sustained is a factual finding that we review for clear error. See United States v. Damon, 127 F.3d 139, 141 (1st Cir. 1997) (factual findings must be supported by a preponderance of the evidence and are reviewed for clear error); United States v. Isaacs, 947 F.2d 112, 114-15 (4th Cir. 1991) (whether bodily injury occurred is factual question).

Here, the court relied on facts contained in the presentence report, see United States v. Skrodzki, 9 F.3d 198, 202 (1st Cir. 1993), such as that the teller suffered a welt as well as whiplash from being struck by King during the robbery.[4] The presentence report also stated that the teller sought medical treatment at the hospital following the incident and that she was unable to return to work for one month due to pain and headaches. Furthermore, the medical records in evidence assert that the teller was diagnosed with cervical strain and a

---

[4]Although the presentence report indicated that the teller had been struck with a gun, the district court did not believe that a gun had been used, but found that King had pushed her to the ground and caused her injury.

-13-

contusion on her scalp, for which she was fitted with a cervical collar and placed on a regimen of Motrin. In short, the court's finding that King caused bodily injury during the commission of the robbery was not clearly erroneous.

Defendants' remaining contentions are without merit. Because we conclude that the court did not err in any of the respects alleged by defendants, we affirm the convictions and sentences.

Affirmed.