# United States Court of Appeals
## For the First Circuit

No. 04-1104

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ PÉREZ-GONZÁLEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch and Howard, Circuit Judges,
and Restani,* Judge.

 Jorge L. Armenteros Chervoni, with whom Pedro J. Varela, was
on brief, for appellant.
 Sonia Torres, Assistant United States Attorney, with whom
H.S. Garcia, United States Attorney, Nelson Pérez-Sosa, Assistant
United States Attorney, Senior Appellate Attorney, and Thomas F.
Klumper, Assistant United States Attorney, were on brief, for
appellee.

April 14, 2006

*Chief Judge of the U.S. Court of International Trade, sitting by
designation.

**HOWARD**, **Circuit Judge**. Defendant José Pérez-González appeals his convictions arising from his violent and destructive conduct at the former U.S. Naval base at Vieques, Puerto Rico. We affirm.

**I.**

We present the facts in the light most favorable to the verdict, see United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003), reserving a discussion of some facts for our analysis.

The U.S. Navy intended to end its presence in Vieques by transferring the lands making up its base to the U.S. Fish and Wildlife Service ("USFWS") on May 1, 2003. Just prior to the transfer, the Navy provided the USFWS with several vehicles and other equipment previously used on the base. Most of the vehicles and equipment were enclosed in a fenced motor pool area within a thirty-five acre compound known as "Camp Garcia." Camp Garcia was approximately one and a half miles from the base's main entrance.

On the night of April 30, 2003, a large crowd gathered outside the base's main gate to celebrate. The crowd included political figures, members of the media, and law enforcement officials on hand to keep the peace. But what began as a peaceful rally quickly turned into a riot.

Shortly before midnight, a large group armed with wire cutters and sledgehammers broke down a section of fencing and entered the base. Nearly simultaneously, others entered (or

attempted to enter) the base at other points. Several of these intruders converged on Camp Garcia, broke down the fence, and commandeered and vandalized vehicles and equipment. With news cameras capturing the action, the rioters vandalized or destroyed a number of government vehicles, equipment and buildings. Most significantly for present purposes, they burned a Boston Whaler boat and a Humvee, and demolished the guard post at the main gate. Images and accounts of the riot were widely broadcast in Puerto Rico and formed the basis for public debate.

Law enforcement officials reviewed photographs and videotapes of the incident and managed to isolate twelve significant participants, eleven of whom they could identify by name. A grand jury returned a six-count indictment against the twelve individuals (including the unidentified "John Doe" defendant who later proved to be Pérez-González) for conspiracy, damaging government property, and damaging government property by fire or explosive. Four counts named the John Doe defendant: a count charging conspiracy to damage government property and to damage government property by fire or explosive, see 18 U.S.C. §§ 371, 1361, & 844(f)(1) (Count I); a count charging aiding and abetting the destruction of the Humvee by means of fire, see 18 U.S.C. § 844(f)(1)(Count III); a count charging the destruction of the concrete entrance gate with damages exceeding $1000, see 18 U.S.C. § 1361 (Count IV); and a count charging the destruction of the

Humvee with damages exceeding $1000, see 18 U.S.C. § 1361 (Count VI). An arrest warrant issued for the John Doe defendant. The warrant included the description "Male, White Hispanic, Approximately 5 Feet 9 Inches and 210 Pounds" and was accompanied by a photograph of Pérez-González standing on a Humvee with a sledgehammer. The photo was provided to the news media and widely publicized. After seeing it, Pérez-González went to the FBI and identified himself as both the "John Doe" defendant named in the indictment and the person in the photo.

Shortly before the scheduled trial, all of Pérez-González's co-defendants pled guilty. After Pérez-González unsuccessfully moved for a continuance or a change of venue, he was tried alone. At the voir dire, the district court questioned the potential jurors about their exposure to news stories about the riot and whether they could be impartial. While most had seen or read about the incident, only ten of the seventy-five potential jury candidates were excused because they could not be impartial.

At trial, the government called law enforcement officers who were at the demonstration or involved in the investigation, government officials involved in the transfer of property between the Navy and the USFWS, and FBI Agent Amado Vega, the primary investigator. The government also introduced videotapes of the demonstration, photographs of the demonstration (some derived from the videotapes) and aftermath, and various other documentary

-4-

evidence. The videotapes were particularly striking, as they showed Pérez-González smashing a Humvee with a sledgehammer, scuffling with police, and repeatedly crashing a government water truck into the guard post until it collapsed. Pérez-González presented no evidence and did not take the stand. The jury convicted him on all counts, and the district court sentenced him to concurrent terms of sixty months on Count I and fifty-one months on Counts III, IV, and VI.

## II.

Pérez-González first argues[1] that his arrest warrant was illegal because it was a constitutionally inadequate "John Doe" warrant. See United States v. John Doe, 703 F.2d 745 (3d Cir. 1983) (warrant describing subject only as "John Doe" was constitutionally insufficient). He also argues that, because of the inadequate warrant and the further failure to provide him with Miranda warnings after he turned himself in, his post-arrest statements identifying himself as the man in the photo should have been suppressed.

Pérez-González first raised these issues in the district court by means of a motion to suppress filed on the first day of trial. The district court denied the motion as to the arrest

---

[1]The government questions whether Pérez-González preserved all issues for plenary appellate review, but opines that they fail on the merits in any event. Except where we note otherwise, we will presume that Pérez-González's contentions were preserved.

warrant, but held a hearing mid-trial regarding the post-arrest statements. The court then concluded that the statements were voluntary.

By waiting until the first day of trial to challenge the warrant and statements, Pérez-González has forfeited these issues. See Fed. R. Crim. P. 12(e);[2] see also United States v. Lopez-Lopez, 282 F.3d 1, 9-10 (1st Cir. 2002); United States v. Bashorun, 225 F.3d 9, 13-17 (1st Cir. 2000). A court may grant relief from the forfeiture if a party establishes cause for its failure to file a timely motion to suppress, see Lopez-Lopez, 282 F.3d at 10, but Pérez-González does not even attempt to do so.

"The question whether an appellate court may review for plain error despite a [Rule 12(e)] waiver, provided that the record enables review, is open in this circuit." Id. at 10 n.4. But even if we assume the power to correct a plain error in circumstances such as these, we would not do so here. The challenged warrant was never formally executed, as Pérez-González voluntarily surrendered to authorities. Further, Agent Vega testified that the warrant was accompanied by a photo, a significant factor in assessing its adequacy. See Fed. R. Crim. P. 4(b)(1)(A) (a warrant must "contain the defendant's name or, if it is unknown, a name or description by which the defendant can be identified with reasonable certainty").[3]

---

[2] Rule 12(f) prior to the 2002 amendments.

[3] Indeed, Pérez-González identified himself from the photo.

-6-

And Pérez-González has presented us with no reason to question the district court's conclusion that the statements were voluntary. Cf. United States v. McLean, 409 F.3d 492, 498-99 (1st Cir. 2005) (defendant's statements made in his offer to cooperate held voluntary).

Pérez-González next argues that his convictions under Counts III and VI violate the Double Jeopardy Clause. He maintains that he is being improperly punished twice for the same offense because 18 U.S.C. § 1361, the subject of Count VI, is a lesser included offense of 18 U.S.C. § 844(f)(1), the subject of Count III.

The Double Jeopardy Clause protects against multiple punishments for the same offense unless the legislature clearly intended to impose multiple punishments for the offense. United States v. Patel, 370 F.3d 108, 114 (1st Cir. 2004). Thus, to determine whether multiple punishments are authorized, we must first seek to determine the legislature's intent. Id. If the legislature's intent is unclear, we apply the Blockburger test, see Blockburger v. United States, 284 U.S. 299 (1932), as a "default rule of statutory construction." Patel, 370 F.3d at 114. "Under Blockburger, . . . the test . . . is whether each [statute] requires proof of an additional fact which the other does not." Id. (internal citation and quotation omitted).

Pérez-González asserts that the legislative intent with regard to the joint application of the two statutes is ambiguous and proceeds to a Blockburger analysis. We accept arguendo that Blockburger applies, but a review of the relevant statutes dooms his argument. While both provisions clearly pertain to the damaging of government property,[4] Section 844(f) includes the additional element of the use of fire or explosives and Section 1361 includes the additional element of a minimum monetary damage

---

[4]Section 1361 provides, in relevant portion:

> Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, . . ., or attempts to commit any of the foregoing offenses, shall be punished as follows:
> If the damage or attempted damage to such property exceeds the sum of $1,000, by fine under this title or imprisonment for not more than ten years, or both; if the damage or attempted damage to such property does not exceed the sum of $1,000, by a fine under this title or by imprisonment for not more than one year, or both.

Section 844(f)(1) states:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than five years and not more than 20 years, fined under this title, or both.

amount (to be charged as a felony[5]), distinctions that Pérez-Gonzalez's counsel conceded at oral argument. The offenses are distinct under Blockburger. See Patel, 370 F.3d at 114.[6]

Pérez-González next maintains that he was entitled to a continuance of the trial or a change of venue due to pretrial publicity. He asserts that media coverage was so intense, biased, and inflammatory -- the media mentioned him by name and directly commented on the evidence against him -- that it was difficult to draw an impartial jury. He also argues that the district court committed reversible error in failing to voir dire each prospective juror outside the presence of the others.

Motions for continuances are reviewed for manifest abuse of discretion, see United States v. Orlando-Figueroa, 229 F.3d 33, 39 (1st Cir. 2000), and motions for a change of venue are reviewed for abuse of discretion, see United States v. Rodriguez-Cardona, 924 F.2d 1148, 1158 (1st Cir. 1991). In assessing the need for a change of venue or a continuance based on pretrial publicity, "the court must determine if prejudice exists from the publicity." Orlando-Figueroa, 229 F.3d at 42. "The test for prejudice

---

[5]We do not address whether a conviction for a misdemeanor Section 1361 violation would raise double jeopardy concerns if paired with a conviction under Section 844(f)(1).

[6]As noted by the government, the two counts are also directed to different conduct: Count III was directed to the burning of the vehicle, while Count VI was directed to the initial damage inflicted on the vehicle with sledgehammers and wire cutters.

sufficient to justify a change of venue is whether (a) the facts show that jury prejudice should be presumed, and (b) if prejudice should not be presumed, whether the jury was actually prejudiced against the defendant." Rodriguez-Cardona, 924 F.2d at 1158. "Prejudice may be presumed where inflammatory publicity has so saturated a community as to render it difficult to draw an impartial jury or where enough jurors admit to prejudice to cause concern as to any avowals of impartiality by the other jurors." Orlando-Figueroa, 229 F.3d at 43. But mere exposure of the potential jury pool to news reports regarding the crime does not, in and of itself, result in an inability to select an impartial jury. See generally United States v. Medina, 761 F.2d 12, 19 (1st Cir. 1985); United States v. Drougas, 748 F.2d 8, 29 (1st Cir. 1984) ("Extensive knowledge in the community of either the crimes or the defendants is not sufficient, by itself, to render a trial constitutionally unfair.").

There is nothing in the record -- no statements by jurors indicating animus, no examples of inflammatory newspaper articles or prejudicial news reports,[7] and no evidence whatsoever of the pervasiveness or tone of the media coverage -- to substantiate Pérez-González's argument. And with regard to the voir dire, only

---

[7]The government contends that the three articles that Pérez-González attached to his motion to continue did not mention him and were objective rather than inflammatory. We concur as to the one article in English, but cannot tell as to the other two because Pérez-González has failed to provide us with translations.

ten of seventy-five potential jurors (less than 14%) stated that they could not be impartial, and the district court promptly excluded them. This is far too few potential jurors indicating bias to warrant any presumption of prejudice. See United States v. Moreno Morales, 815 F.2d 725, 734-36 (1st Cir. 1987) (that 25% of potential jurors believed defendant guilty not sufficient). Moreover, the district court repeatedly reminded the jurors to keep an open mind and to avoid media reports or other sources of information about the case.

Pérez-González also maintains that the district court erred in questioning potential jurors about bias as a group rather than individually out of the presence of the others. However, he failed to raise this argument in the district court. But even if he had, the court's procedure would not constitute reversible error. While we have endorsed the concept of individual questioning in high profile cases, see Medina, 761 F.2d at 20, we have approved "group" questioning of potential jurors about bias as within the district court's broad discretion in conducting voir dire, see Orlando-Figueroa, 229 F.3d at 43.[8] Pérez-González has

---

[8]We note as well that this is not a case where juror partiality would have inevitably worked against Pérez-González. The Vieques issue is a complicated one, fostering much civil disobedience, see, e.g., United States v. Ayala, 289 F.3d 16 (1st Cir. 2002); United States v. Ventura-Melendez, 275 F.3d 9 (1st Cir. 2001), and there might well have been potential jurors predisposed to be sympathetic to Pérez-González.

-11-

presented no basis for questioning the appropriateness of the district court's voir dire procedure in this case.

Pérez-González next asserts that the videotapes should not have been admitted because they were improperly authenticated, misleadingly edited, misleadingly presented, and unduly prejudicial within the meaning of Fed. R. Evid. 403. We review a district court's decision to admit or exclude evidence for abuse of discretion. See United States v. Perez-Ruiz, 353 F.3d 1, 10 (1st Cir. 2003). As to prejudice, "[t]rial judges enjoy wide latitude in making Rule 403 rulings and are only overturned after a showing of egregious error." United States v. Kornegay, 410 F.3d 89, 96 (1st Cir. 2005). As to authentication, "Federal Rule of Evidence 901(a) requires the trial court to determine if there is a reasonable probability that the evidence is what it is purported to be." United States v. Carlos Cruz, 352 F.3d 499, 506 (1st Cir. 2003) (internal citation and quotation omitted); see also United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997)("[I]f the district court is satisfied that the evidence is sufficient to allow a reasonable person to believe the evidence is what it purports to be, Rule 901(a) is satisfied and the jury may decide what weight it will give the evidence.").

The district court's admission of the videotapes was within its broad discretion. The news photographers were called as witnesses and authenticated the videotapes, and Pérez-González

cross-examined them about their editing procedures.  He provides no inkling why this was inadequate.  Pérez-González's claims about misleading and prejudicial presentation -- an alleged "slowing up" of the tape and the inclusion of inflammatory audio commentary -- are simply not supported by the record (and would not constitute reversible error if they were).  The videotapes were also highly relevant, as they showed the offense as it occurred and corroborated many aspects of the government witnesses' testimony.  Finally, they were prejudicial only in the sense that they were damaging.  This is not "prejudice" within the meaning of Rule 403.  See, e.g., United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005); see also United States v. Curtis, 344 F.3d 1057, 1067-68 (10th Cir. 2003).

Pérez-González next argues that certain photographs admitted into evidence did not accurately depict the objects photographed at the relevant time, included "visual elements" that were irrelevant and prejudicial, and should have been excluded under Fed. R. Evid. 401, 402, and 403.

Pérez-González first challenges the admission of exhibit 57a -- which shows a masked individual in front of a damaged Humvee with its front seat on fire -- on the ground that there is no indication when the photograph was taken or that any of the perpetrators wore masks.  But the photograph is clearly relevant to Count III (which involved the initial burning of the Humvee) and

corroborates the testimony of government witnesses that several rioters wore masks.

Pérez-González also challenges exhibit 16 (four news photos on one page) on the ground of "blurriness," and exhibits 56-60 (news photos) on the ground that they include commentary and opinion. The former characterization is inaccurate, as the pictures are sufficiently clear, and the latter is specious, as the photos do not have captions or any accompanying text.

Finally, Pérez-González makes a generalized "global" challenge to exhibits 17-51. Again here, his argument is baseless. All the photos were relevant, properly authenticated, accurately depicted the damage done, and corroborated the testimony of the government witnesses.[9]

Pérez-González next posits that his in-court identification by various law enforcement officials, who lacked an adequate opportunity to observe him during the riot, should have been disallowed because the procedure employed was improperly suggestive and likely to yield a misidentification. He also argues that the trial court should have permitted him to sit in the gallery and ordered an in-court line-up.

In evaluating an identification, the court looks first to whether an inappropriately suggestive procedure was employed. See

_____

[9]To the extent Pérez-González seeks to challenge other photographic evidence, he has done so too casually to merit further discussion. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

-14-

United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003). If so, the court must "decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." Id. (internal citation and quotation omitted). Exclusion of (or prohibition of) an identification is only appropriate if the court believes there is a very substantial likelihood of irreparable misidentification. Id.; see also United States v. Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993) ("[I]t is only in extraordinary cases that identification evidence should be withheld from the jury.")(internal quotation and citation omitted).

The district court acted well within its discretion in permitting the jury to consider the identification evidence. All the identifying officers saw videotapes and photographs of Pérez-González before trial. Indeed, because law enforcement officials were intently reviewing those materials in an attempt to identify the perpetrators, a careful review of the visual evidence was an essential step in the investigation. This is not a situation involving a dubious photo array or a one-person show-up. See, e.g., Jesus-Rios, 990 F.2d at 677-78. Further, there is no entitlement to an in-court line-up or other particular procedure. See Curtis, 344 F.3d at 1063. And in any event, the argument has a bit of a surreal quality to it because Pérez-González admitted that he was the individual in the photograph which accompanied the

indictment and which was generated from the videotape of the riot that the officers reviewed.

Pérez-González next challenges the sufficiency of the evidence establishing the conspiracy and the value of the government property destroyed.[10]  "We will affirm the conviction if, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  Boulerice, 325 F.3d at 79 (internal citation and quotation omitted).  The government need not succeed in "eliminating every possible theory consistent with the defendant's innocence," and "[w]e will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (internal citation and quotation omitted).

In challenging his conspiracy conviction, Pérez-González emphasizes that mere presence or similar actions to other individuals is insufficient to show membership in a conspiracy.  He points out that there was no evidence of communication by cell phone or walkie-talkies, and that the incident can only be

---

[10]In his brief, Pérez-González has not challenged his conviction under 18 U.S.C. § 844(f)(1) for aiding and abetting the destruction of the Humvee by fire.  He has thus waived the claim.

-16-

considered a riot and not the result of an organized criminal endeavor.

> To prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy. More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: intent to agree [with his co-conspirators] and intent to commit the substantive offense. Such proof may consist of circumstantial evidence, such as acts committed by the defendant that furthered the conspiracy's purposes.

United States v. Llinas, 373 F.3d 26, 30 (1st Cir. 2004) (internal citation and quotation omitted). The agreement "need not be express, but may consist of no more than a tacit understanding." United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993) (internal citation and quotation omitted). "[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." United States v. Martinez-Medina, 279 F.3d 105, 113 (1st Cir. 2002). However, mere presence at the scene or simple association with the conspirators will not suffice to establish guilt. Llinas, 373 F.3d at 32.

There was sufficient evidence to support the conspiracy conviction. Various co-defendants came to the event armed with sledgehammers and wire cutters -- odd things to bring to a celebration unless one was planning mischief. In addition, the

-17-

attack appeared coordinated, with participants spilling on to the base at multiple entry points and nearly simultaneously. Moreover, the perpetrators covered the mile and a half from the main gate to Camp Garcia and the motor pool in about twenty minutes, which is suggestive of a planned assault. And if the evidence of a conspiracy is sufficient, there can be no doubt that the jury reasonably found Pérez-González to be a conspirator. He is shown on videotape smashing the Humvee with a sledgehammer, scuffling with police, and driving a water truck into the main gate until it collapsed.[11] While the jury conceivably could have reached a different conclusion, that does not suffice to undermine the verdict. See Echeverri, 982 F.2d at 678("we require only that a jury's verdict be supportable, not that it be inevitable"); United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991)("the factfinder may decide among reasonable interpretations of the evidence").

Pérez-González next argues that the government failed to prove that the destroyed Humvee and main gate were valued at over $1,000 each. He asserts that the government's own records establish that the Humvee was transferred from the Navy to the

_____

[11]Significantly, several individuals rode along with Pérez-González in the water truck and helped him escape arrest by grabbing the would-be arresting officer around the neck. A rational jury could conclude that confederates, rather than mere bystanders, were involved with Pérez-González in these dangerous activities.

USFWS at a value of $0, and that the main gate only cost $450 to build.

These arguments are frivolous.  The government called witnesses who testified that the Humvee was only valued at $0 for purposes of the transfer because two federal entities (as opposed to an outside purchaser) were involved.  Moreover, the government presented evidence that the replacement cost and residual value of the Humvee far exceeded $1000.  And, while the gate may have only cost $450 to construct, it was constructed over forty years ago. Its current value (or replacement cost) was supportably pegged at more than $40,000.

Finally, Pérez-González challenges the jury instructions regarding the conspiracy charge and the value of the government property destroyed.  But he has not explained what was wrong with the conspiracy charge, and his attack on the instructions is both inadequately elaborated and, so far as we can tell, based upon the specious suggestion that the jury could have found the property destroyed to be worth less than $1000.

**Affirmed.**