392 So.2d 280 (1980)
Charles Hugh BROWN, Appellant,
v.
STATE of Florida, Appellee.
No. AA-179.
District Court of Appeal of Florida, First District.
December 2, 1980.
Rehearing Denied February 3, 1981.
Norman J. Abood, Jacksonville, Judith A. Bass and Theodore L. Tripp, Jr., of Simon, Schindler & Tripp, Miami, and Richard C. McFarlain, Tallahassee, for appellant.
Jim Smith, Atty. Gen., and Wallace E. Allbritton, Asst. Atty. Gen., for appellee.
McCORD, Judge.
On June 15, 1977, we rendered our decision affirming the trial court without opinion on this appeal. Thereafter, upon appellant's petition, the Supreme Court of Florida denied certiorari and subsequently denied petition for rehearing. Appellant then petitioned the United States Supreme Court for writ of certiorari to review this court's *281 decision and on April 21, 1980, that court entered its order and mandate granting the petition for writ of certiorari, vacating our judgment and remanding the case to this court for further consideration in light of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). We subsequently received from the parties briefs on the applicability of Payton and in compliance with the Supreme Court's mandate have reconsidered this cause. We reverse and remand to the trial court for further proceedings.
The trial court adjudged appellant guilty of possession of more than five grams of marijuana with intent to sell and guilty of possession of a device, contrivance, instrument, or paraphernalia, to wit: a pipe, with intent that said device be used for unlawfully administering marijuana. The convictions were rendered following nolo contendere pleas by appellant with reservation of his right to appeal the trial court's order denying his motion to suppress evidence. The evidence sought to be suppressed consisted of articles seized at appellant's home and premises at the time of the arrest of appellant and other persons and articles subsequently seized upon execution of a search warrant to search the "premises together with the yard and curtilage thereof ..." Appellant contends the articles were unlawfully seized because the seizure resulted from an unlawful arrest; that the arrests of him and others in his home were unlawful because they were made without a warrant and without the existence of exigent circumstances to justify entering his home without a warrant.
As pointed out in Payton, Florida is one of 24 states which have, until the Payton decision, permitted warrantless entry into the home to arrest even in the absence of exigent circumstances (445 U.S. 598, 100 S.Ct 1386, 63 L.Ed.2d 658). By its ruling in Payton, the Supreme Court, for the first time, holds warrantless nonconsensual entry into a home for the purpose of making a routine felony arrest to be a violation of the Fourth Amendment of the United States Constitution in the absence of exigent circumstances justifying such entry. In so ruling, the Supreme Court said:
But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home  a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable Government intrusion." Silverman v. United States, 365 U.S. 505, 511, [81 S.Ct. 679, 682] 5 L.Ed.2d 734, 97 A.L.R.2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.
We must consider the pertinent facts in the case sub judice in order to apply this new ruling of the United States Supreme Court.
Appellant, during the spring of 1975, was under surveillance by undercover police on suspicion of dealing in drugs in Jacksonville, Florida. The following is a summary of the undisputed evidence presented at the hearing on the motion to suppress: Officer D.E. Taylor, working under cover, met Anthony J. Cataldo at approximately 10:30 p.m. on May 24, 1975. Cataldo advised that he had a large quantity of marijuana and Taylor said he was interested in purchasing 20 pounds. Cataldo would not take Taylor directly to the source but agreed to take him to a location near the source. *282 Cataldo then directed Taylor to a location near the intersection of Valdura and 103rd Street, where Taylor gave him $820 front money with which to buy 20 pounds of marijuana. Cataldo advised that he would return in a few minutes with the marijuana. Taylor had an idea where Cataldo would obtain the marijuana and had a surveillance team, Officers Howell and Higginbotham, set up at the premises located at 6209 Shindler Drive, which Taylor believed to be occupied by appellant. Taylor was in radio contact with the surveillance unit and he testified that he had reason to believe that appellant was involved in heavy drug traffic.
When Cataldo departed from the rendezvous to make the purchase, he advised that when he returned in a few minutes Taylor was to follow him down Valdura Street and that he (Cataldo) would pull off the road and turn the marijuana over to Taylor. The $820 front money that Taylor gave to Cataldo was marked in the sense that Taylor had the serial numbers for the bills. When Cataldo departed, Taylor so advised the surveillance unit and requested them to make contact if and when Cataldo arrived at 6209 Shindler Drive. Cataldo was driving a green Chevrolet Monza. In approximately a minute and a half to two minutes, the surveillance unit notified Taylor that Cataldo had pulled into the driveway of the premises at Shindler Drive. Officer Howell of the surveillance unit was situated across the street from the premises with a clear view. He observed the Monza enter the yard and drive up to the house. The driver exited the automobile and walked around to an area in the back of the house. A few minutes later, he reappeared with another individual and walked down beside the garage where Howell lost sight of them for three or four minutes. Then two individuals reappeared and walked up to the automobile. The taller of the two (not the person who drove up in the car) placed a bundle or package in the front from the driver's side of the Monza. When the Monza left the premises, Officer Howell immediately radioed Officer Taylor and advised that the Monza was headed back in his direction. This was approximately 10 minutes from the time Cataldo had left Taylor. Approximately one-half to two minutes later Cataldo arrived at the rendezvous point, and Taylor followed him down Valdura Street at which time Cataldo turned six pounds of marijuana over to him. At this point, Taylor placed Cataldo under arrest and advised him of his rights.
After advising Cataldo of his rights, Taylor questioned him and Cataldo stated that he had been to the house on Shindler Drive where he got the marijuana from a man named Chuck Brown. Cataldo also told Taylor that Brown had told him that he had already sold 400 pounds of marijuana that day. In addition to the six pounds of marijuana that Cataldo had in his possession for Taylor, he also had two $20 bills of the marked money that Taylor had given him to purchase the 20 pounds. Cataldo advised that he was paying $130 a pound for the marijuana and selling it for $160 a pound. Cataldo also advised that he could not see any additional marijuana at Brown's house but that Brown had told him he had at least 20 pounds because that was the amount that Taylor initially planned to buy.
As to the exact location on the premises from which the marijuana came, Cataldo said that it came from the garage. After placing Cataldo under arrest and searching him, Taylor next advised the surveillance unit that the buy had been consummated and that Cataldo had been placed under arrest. Subsequently, Taylor telephoned the assistant state attorney, told him what had transpired and sought advice as to what should be done next. The assistant state attorney told Taylor that he believed there was sufficient probable cause to get a search warrant.
Following the phone call, Taylor and the other officers went to the premises at 6209 Shindler Drive. Taylor was the first officer to arrive. The premises were fenced with a gate at the driveway. Taylor drove through the gate and into the premises, and as he got out of the car, a man came out the back door of the house. [He subsequently discovered this man was Chuck Brown (appellant).] *283 Upon exiting the car, Taylor was standing at the back of the house, and appellant was standing on a small back porch or stoop. Taylor advised appellant of his identity and that he was under arrest.[1] At the same time, Taylor could smell burning marijuana from inside the residence. Another officer behind Taylor came up and detained appellant while Taylor entered the back door of the residence and walked into a small dining room area. At this point, Taylor saw four or five people sitting around a table, one of whom was smoking a marijuana cigarette. He advised all of the individuals that they were under arrest and then checked the rest of the house to determine whether anybody else was inside. He made no search of the house at that time but was simply looking for other individuals who might be in the house. All of the individuals were searched in the dining area, and marked bills initially given to Cataldo were recovered from appellant's pocket. All of the individuals, with the exception of appellant, were transported to jail. Officers Howell and Higginbotham remained with appellant until Taylor could return with a search warrant. None of the officers conducted any form of search of the house or garage until the search was subsequently made pursuant to a search warrant which was obtained by Taylor. Appellant told Taylor that he lived there and was the only person who lived there.
The search warrant was issued for the premises and the curtilage described in the warrant. The affidavit upon which the search warrant was issued was based entirely upon the circumstances of the marijuana buy which had been made at the premises by Cataldo. It did not mention the subsequent intrusion by the officers into the premises and the arrest of the occupants.
Pursuant to the ruling of the United States Supreme Court in Payton, the arrests were unlawful in that they were made upon intrusion into appellant's home without a warrant. No exigent circumstances for entering the premises without a warrant have been shown to exist. Thus, under Payton, the motion to suppress should have been granted as to items seized upon the search of the individuals' persons and the immediate area made at the time of their arrest. These would include the marked bills and other unmarked money recovered upon search of the person of appellant when arrested. They would also include the roach clip which was in possession of the individuals around the table when the officer entered the kitchen, as well as the yellow legal pad, also referred to as a tally sheet, which was recovered from one of the individuals at the kitchen table at the time of the arrest.
There was no error in denial of the motion to suppress other items which were seized upon execution of the search warrant. These items include 180 pounds of marijuana, marijuana plants, marijuana pipes, marked money found in a wallet in the bedroom of the house, two sets of scales, and marijuana found in a tin container on the kitchen table. It appears from the evidence that none of these items were discovered until the search was made pursuant to the search warrant. The fruit of the poisonous tree doctrine enunciated in *284 Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), is not applicable to the warrant search because the issuance of the warrant was not predicated in any way upon, and thus did not result from, the unlawful arrests. The evidence obtained upon the warrant search had an origin independent of the arrests and was in no way tainted by the arrests. The warrant was issued solely upon the information contained in the affidavit for search warrant showing probable cause to believe appellant's premises contained contraband. That information related only to the buy of marijuana by Cataldo and the circumstances surrounding it.
Appellee contends that Payton should not be applied retrospectively. This contention is without merit. See Busch v. State, 392 So.2d 272 (Fla. 1 DCA, 1980).
Appellee also contends that Payton is not applicable to the factual situation sub judice because appellant had stepped out of the back door of his house onto the porch when arrested; that the intent of Payton was to protect intrusion into one's home. We are unable to agree under the facts of this case. In this connection we have considered the somewhat similar case of United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). There an undercover officer arranged a heroin buy with an individual whom he immediately placed under arrest. The officer was then informed that the money was in the possession of one Mrs. Santana, who lived approximately two blocks away. The officers proceeded to Mrs. Santana's house in a van. When they arrived, they saw her standing in the doorway of her house with a brown paper bag in her hand. They pulled their vehicle to within 15 feet of where Mrs. Santana was standing and got out of their van while shouting "police" and displaying their identification. As they approached, Mrs. Santana retreated into the vestibule of her house. The officers followed her through the open door and caught her in the vestibule. As she attempted to pull away, the paper bag which she was holding tilted and what appeared to be heroin in glazed paper packets fell to the floor. She was placed under arrest and subsequently charged with federal narcotics violations. The Supreme Court upheld the arrest holding:
... a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson [United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976)] by the expedient of escaping to a private place.
The two questions which the court considered were (1) whether, when the police first sought to arrest Santana, she was in a public place; and (2) whether her act of retreating into her house could thwart an otherwise proper arrest. As to the first question, the court concluded that Mrs. Santana "was not in an area where she had any expectation of privacy." The court stated, "She was not merely visible to the public but she was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." In contrast to Santana, the officers in the case sub judice drove into Brown's enclosed yard at approximately 1:45 a.m. and arrested him when he came out on his back porch. Both the officers and Brown were in a place where Brown, particularly at that time of night at his back door, could expect privacy. He was on his back porch, a part of his house, and the officers had driven into his enclosed private yard. On the other hand, in the Santana opinion, there is no indication that the officers drove into an enclosure of Mrs. Santana's premises. The only logical conclusion we can reach from the opinion is that, unlike the case sub judice, the officers did not drive their vehicles onto private property to reach the house but set the arrest in motion from the public street.
We reverse with directions to grant the motion to suppress insofar as it seeks suppression of the evidence seized upon the arrest of appellant and the other individuals and to deny the motion in other respects. Reversed and remanded for further proceedings consistent herewith.
MILLS, C.J., and LARRY G. SMITH, J., concur.
NOTES
[1] There is some confusion as to the exact spot where appellant was arrested. On direct examination, Taylor testified as follows:

We drove into the driveway and as I got out of the car  I was in the first car that arrived  a man came out of the back door, a man I now know as Chuck Brown. I was standing right at the back door of the house. I advised him that we were police officers and he was under arrest and at that point I could smell burning marijuana from inside the residence. Somebody else was coming up behind me and they detained Mr. Brown. I went on into the residence and walked into a little dining room area that projects into the kitchen.
On cross-examination he testified:
Q Where was Mr. Brown at the time you placed him under arrest?
A He was in the kitchen. He was arrested at the back porch. We asked Mr. Brown to step inside so we could round up everybody involved so we would have them in one area so we could watch them.
For the purpose of our ruling, we consider that the arrest was either made or initiated on the back porch.