STATE OF MAINE                  UNIFIED CRIMINAL DOCKET

CUMBERLAND, ss.     STATE OF MAINE      DOCKET NO.: CUMCR-18-3666
Cumberland, ss, Clerk's Office

SEP 2 4 2019

RECEIVED

STATE OF MAINE,                )
                                 )
                                 )
      v.                    )         ORDER ON DEFENDANT'S
                                 )         MOTION TO SUPPRESS
                                 )
JEFFREY BOILARD            )
                                 )
      Defendant          )

## I.   Procedural Background

Pending before the Court is Defendant Jeffrey Boilard's Motion to Suppress evidence found during a warrantless search in the backyard of 32 Hennessey Avenue in Brunswick, Maine ("32 Hennessey"). Defendant also asserts that evidence obtained from his arrest should be suppressed because the arresting officers lacked probable cause. A hearing was held on July 25, 2019.

As a preliminary matter, the State challenged the Defendant's standing to contest the warrantless search of 32 Hennessey on Fourth Amendment grounds. The State argued that Defendant was not an overnight guest of Jonathan "Eric" Hummel ("Hummel"), who resides in Apartment "D" at 32 Hennessey, and therefore did not have a legitimate expectation of privacy in the premises.[1] Based on the Defendant's testimony,

---

[1] The Fourth Amendment of the United States, and as similarly stated in the Maine Constitution, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV. However, in order to contest the admission of the evidence on Fourth Amendment grounds the defendant must demonstrate that he had a legitimate expectation of privacy in the place searched. *See State v. Carton*, 2016 ME 119, ¶ 15, 145 A.3d 555 ("this authority applies to defendants who have a legitimate expectation of privacy in the location of the search."). It is well settled law that an individual's status as

the Court found that the Defendant was an overnight guest of Hummel.[2] As such, the Court concluded that the Defendant had an expectation of privacy in Hummel's residence.

The State next contends that 32 Hennessey is a multi-unit apartment building and challenges whether the Defendant has a reasonable expectation of privacy in the backyard of 32 Hennessey. Defendant asserts there is no evidence to support that 32 Hennessey is a multi-unit apartment building and, even if it is, there is no evidence that any of the other units at 32 Hennessey are occupied.[3] Accordingly, Defendant argues that the search was conducted in the curtilage of 32 Hennessey and must be suppressed. In addition, the Defendant asserts that law enforcement lacked probable cause and, therefore, seeks suppression of evidence obtained in the warrantless arrest of the Defendant.

The Court heard testimony from Jerod Verrill and Chad Carleton, both Special Agents with the Maine Drug Enforcement Agency. The Court also heard testimony from the Defendant. The Court admitted into evidence State's Exhibit #1 (an aerial photograph

---

an overnight guest is enough to show he had a reasonable expectation of privacy in a third persons' home. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990).

[2] Defendant testified that he and Hummel have been best friends since they were 9-years-old. Over the years, Hummel has lived at a number of places in Brunswick and Defendant has stayed at all of them. Defendant testified that he has stayed at Hummel's current residence on 5 or 6 occasions. On July 8, 2018, Defendant arrived at Hummel's residence, stayed the night, and remained at the residence until his arrest on July 9, 2018.

[3] In a post-*Miranda* interview, Hummel acknowledged that he lives in apartment "D" at 32 Hennessey. He stated that he primarily uses the back window facing the railroad tracks to enter the apartment instead of the front door because of his roommate, "Crazy Stacey." It is unclear from the testimony and aerial photographs of 32 Hennessey just how many apartments are in this particular structure. Agent Carleton, however, identified the apartment's designation of "D" in front of one of the entrances, and inferred that 32 Hennessey contained at least four individual units. Despite their respective arguments, neither party presented direct evidence as to the number of units in the apartment building nor the presence of other tenants.

of the property at 32 Hennessey), Defendant's Exhibit #1 (a photograph of the property taken from Hennessey Avenue), Defendant's Exhibit #2 (an aerial photograph of the property at 32 Hennessey), Defendant's Exhibits #'s 3 and 4 (two images of the Town of Brunswick Tax Assessor Map of the property at 32 Hennessey) and Defendant's Exhibit #5 (a recording of the police interview of Johnathan "Eric" Hummel.)

## II.    Findings of Fact

In mid-June 2018, Agent Verrill received information from a concerned citizen that Hummel was selling cocaine and heroin at 32 Hennessey Avenue in Brunswick, Maine.[4]

On July 5, 2018, Agent Verrill learned from Agent Carleton that a source of information ("SOI") had been at 32 Hennessy earlier that day and observed Hummel selling drugs.[5] The SOI told Agent Carleton that Hummel's supplier, a man named "Jeff," was also present. He told Agent Carleton that he had seen them at 32 Hennessey in the vicinity of a digital scale and approximately ten grams of cocaine. He described "Jeff" as a man in his mid-forties with brown hair, 5'8" to 5'10. He thought "Jeff" was from New Hampshire. He had seen a truck with New Hampshire plates and a Harley Davidson motorcycle at 32 Hennessey.[6] On July 7, Agent Carleton heard from the SOI that more

---

[4] Later that month, his source said other drugs, including, methamphetamines (uppers), opiates (downers), suboxone (boxes) and morphine (morphs) were being sold out of 32 Hennessey.

[5] Agent Carleton testified that between July 5 and July 9, 2018, he talked to and/or texted his SOI several times a day.

[6] Defendant testified that his girlfriend owned a Ford pick-up truck and that he or she had driven it to 32 Hennessey on July 8th. He also testified that he had a Harley Davidson motorcycle that he had driven to 32 Hennessey sometime around the 3rd to the 5th of July. Apparently, the motorcycle had broken down and he had left it at 32 Hennessey. He had it repaired and had come back to retrieve it.

product was coming. On July 9, the SOI confirmed that "Jeff," Hummel's supplier, was at 32 Hennessey and had cocaine to sell.

Acting on this information, Agents Carleton and Verrill conducted surveillance of 32 Hennessey from the parking lot of the Women's Fitness Center and Spa, which is located on the other side of the railroad tracks in back of 32 Hennessey. ( See St. Ex. 1.) From this location, they had a fairly unobstructed view, both with and without the use of binoculars, into the backyard of 32 Hennessey and could see the long driveway, with other homes off of it.[7]

The Agents confirmed that Hummel was at 32 Hennessey. Agent Carleton saw a man who matched the SOI's description of "Jeff." The Agents also observed approximately six to eight other people in the back yard. Some of the individuals were known to the Agents to be drug users in the Brunswick area. They observed two tents set up in the backyard by the railroad tracks.[8]

During the two hours of surveillance in the early afternoon, the Agents also observed pedestrians walking into and out of the back yard as well as number of vehicles coming and going from 32 Hennessey. These individuals would stay for a short duration and then leave. They testified this is indicative of "typical drug deal behavior." They also saw a red Harley Davidson motorcycle that they suspected belonged to "Jeff."

The SOI agreed to participate in an arranged "buy" in the parking lot of Shaw's in Brunswick. The SOI contacted Hummel who agreed to sell him 3.5 grams of cocaine for

---

[7] 32 Hennessey is the second house at the end of a long driveway. (Def.'s Ex. 2- 4.) The residence has trees on both sides, and railroad tracks run behind it. (Def.'s Ex. 2). There is no fence or other structure that obstructed their view.

[8] At hearing, the Defendant's testimony confirmed that six to eight friends of Hummel were in the backyard, including Stacey, *who lived upstairs,* at 32 Hennessy. He said there were two tents set up in the backyard. He knew one of the people living in one of the tents but did not know who lived in the other. (Emphasis supplied.)

$300. The Agents saw a Ford Focus pull up to 32 Hennessey. They observed Hummel get into the car and followed it to Shaw's. Hummel got out and met with the SOI. After the exchange was made, the Agents and other law enforcement approached Hummel and the driver.[9] Hummel was found to be in possession of a small baggie containing 3.5 grams of white powder. A field test of the powder came up positive for cocaine.

Hummel was arrested, read *Miranda* and questioned. The Agents' focus was on "Jeff."[10] Hummel acknowledged that "Jeff" Boilard was back at the residence. He said he would help them but wanted a "deal" first, which they declined to make. He said Jeff showed up that day, brought cocaine, and he (Hummel) would sell it for him. He did not know the amount of drugs Jeff had with him. He said that Jeff was leaving soon and if he didn't get back in two minutes, he'd be f***ked." (Def.'s Ex. 5.) He confirmed that Jeff drives a motorcycle.[11]

The Agents determined they would drive by 32 Hennessey to see if Defendant's motorcycle was still there and then return to the Brunswick Police Department to formulate a plan. After seeing the motorcycle was still there, they decided to go 32 Hennessey, contact the Defendant and secure the residence in anticipation of obtaining a search warrant.

Instead of walking the full length of the driveway, Agents Carleton and Verrill

---

[9] Michael Bourgoin was the driver of the Ford Focus. He was subsequently found to be in possession of heroin. He was summonsed and released. The Agents were concerned that Mr. Bourgoin would get word back to the people at 32 Hennessey about the drug bust at Shaw's.

[10] Among other things, Hummel was told, "We want the main guy and the rest of the drugs."

[11] Hummel was subsequently taken to the Brunswick Police Department and booked.

along with several other officers, came in from the side and walked up to 32 Hennessey.[12]

As they walked up the driveway, Agent Carleton recognized the Defendant sitting on a bench in the backyard. He called out, "Jeff?" to which the man responded, "Boilard?"

Agent Carleton testified that he "saw [the Defendant] move something in his hand to the side and watched as a dark object fell through the bench slats, landing slightly under and to the back of the bench."[13] Agent Carleton called out, "I see what you dropped there." He told him to stand up. He patted him down, placed him in handcuffs and placed him under arrest. While the Defendant was handcuffed and standing next to another officer, Agent Carleton found the dark object - a pouch with a zipper. He opened the pouch and discovered twenty-five bags of cocaine. The Defendant was taken to the Brunswick Police Department.

While the plan had been to secure 32 Hennessey in anticipation of a search warrant, Agents Verrill and Carleton and the other officers involved determined that what they seized from Mr. Boilard was all that was likely to be found on the premises.[14] Agent Carleton testified, "we had what we came here for."

### III. Conclusions of Law

   *A. Fourth Amendment Protection Within the "Curtilage" of a Dwelling*

---

[12] The side of the driveway is lined with trees. They had observed other people walking through them to get to the house. They did not encounter a fence, gate, large dog, or "no trespass" or "private property" signs.

[13] The Defendant denies he dropped anything.

[14] Based on his training and experience, Agent Verrill stated that drug dealers will keep the drugs close to them.

The critical issue is whether the tenant of an apartment building has a reasonable expectation of privacy in a shared backyard. Specifically, whether the backyard of a multi-unit apartment qualifies as "curtilage" for purposes of the Fourth Amendment. The Supreme Court follows "a two-part test for analyzing the expectation of privacy question: first, whether the movant has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (2009). It is well established that a person has a reasonable expectation of privacy in the "curtilage" of one's home. Specifically, "the areas 'immediately surrounding and associated with the home' are 'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984). As stated in *Jardines*, "[t]his right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity . . . ." *Id.* As such, warrantless searches within the curtilage of one's home "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 232 U.S. 383, 392 (1914).

Typically, when a defendant seeks suppression of evidence obtained from a warrantless search "the government bears the burden of demonstrating that the search was lawful." *Id.* However, the burden remains with Boilard, an overnight guest, to demonstrate the search occurred in a constitutionally protected area.

B. *Reasonable Expectation of Privacy in Single-Family and Multi-Unit Dwellings*

In this case, the backyard and bench area where the search and arrest occurred may very well be considered curtilage for purposes of a single-family dwelling. *See United States v. Dunn*, 480 U.S. 294, 301 (1987) (detailing four factors courts should

consider to determine whether an area qualifies as curtilage). However, as Defendant correctly points out, for purposes of a Fourth Amendment analysis, the distinction between a single-family home and a multi-unit apartment building is relevant to determine whether one's expectation of privacy in certain shared spaces is reasonable.

The First Circuit has held that "a person cannot have a reasonable expectation of privacy . . . in such a well-travelled common area of an apartment house or condominium." *United States v. Cruz Pegan*, 537 F.2d 554, 558 (1ª Cir. 1976) (a common basement area did not form part of the defendant's curtilage). More clearly stated, "...in this circuit... a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." *United States v. Hawkins*, 139 F.3d 29, 32-33 (1ª Cir. 1998). Indeed, "[i]n a modern urban multi-family apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control." *Cruz Pegan*, 537 F.3d at 558 (quoting *Commonwealth v. Thomas*, 358 Mass. 771, 774-75, 267 N.E. 2d 489 (1971).

In *United States v. Constant* the United States District Court for the District of Maine held that a defendant does not have a reasonable expectation of privacy in the back porch of a multi-unit apartment. *United States v. Constant*, No. 2:12-cr-0065-NT, 2013 U.S. Dist. LEXIS 15524, at *15-16 (D. Me. Feb. 5, 2013), *aff'd, remanded for sentencing*, 814 F.3d 570 (1ª Cir. 2016). Relevant to the court's determination was the absence of any evidence the tenant had the exclusive right to exclude others from the porch. *Id*. The court articulated its reasoning as follows:

> Because the area in question is both open to the public and potentially shared by occupants of the second apartment, the Court finds that any subjective expectation of privacy is not objectively reasonable. Neither can the back entryway and porch be considered part of the curtilage of the Defendant's apartment.

*Id.* With this directive in mind, the Court's reasonableness analysis must focus on whether the tenant possessed the exclusive authority to exclude others from the area searched.

It is clear that when a dwelling is divided into multiple self-contained apartments, a tenant does not have exclusive control over common areas shared by other tenants. *See e.g. Hawkins*, 139 F.3d 29 at 32. It is less clear, however, whether Hummel, and by extension his overnight guest, did or did not have exclusive control over the backyard at 32 Hennessey.

From the evidence presented, it is unclear how many units there are at 32 Hennessey. There is evidence, however, that Hummel lives in apartment "D" and, although they would use different entrances (she the front door and he the window in the back), he has a roommate, Stacey. From Hummel's statement to police that he lives in apartment "D" and Agent Carleton's testimony that he saw a "D" on one of the unit entrances, it is reasonable to infer that there are other apartments, presumably "A," "B" and "C," at 32 Hennessey. Albeit scant, from the evidence presented and the reasonable inferences that may be drawn, there is sufficient evidence for this Court to determine that 32 Hennessey is not a single-family dwelling, but rather a multi-unit apartment building.

Even accepting this conclusion, Defendant asserts that if the other units are vacant, Defendant is nevertheless entitled to a reasonable expectation of privacy in the backyard. Essentially, Defendant argues that because there are no other tenants, there can be no shared common spaces. Despite the apparent, but not proven, absence of other tenants, the underlying justifications limiting the curtilage of 32 Hennessey appear to be satisfied. For instance, the other apartments could become occupied by tenants at any time and those tenants would have the right to use the backyard. The landlord or owner of 32 Hennessey could enter or occupy the other apartments and would have the right to use

the backyard. Accordingly, Hummel does not have the right to exclude others from the backyard; and, any subjective expectation of privacy is not objectively reasonable.

Based on this finding, the Court need not delve into whether the Agents truly entered the premises "in anticipation" of a search warrant, because the search did not occur in the curtilage of Hummel's apartment at 32 Hennessey. Because the search did not occur in a constitutionally protected area, the State's minimal intrusion into the backyard of 32 Hennessey did not result in a Fourth Amendment violation.

*C. The Agents Were Lawfully on the Premises*

Even if the Court were to find the search and subsequent arrest took place within the "curtilage" of 32 Hennessey, the Agents warrantless entry would still be considered reasonable on two separate grounds. First, an exception to the warrant requirement permits officers to lawfully enter a home's curtilage to secure the residence in anticipation of a search warrant. Specifically, the Law Court stated:

> Officers may temporarily secure a residence if (1) the officers have probable cause to believe the home contains evidence of a crime; (2) the officers have reason to believe that evidence could be destroyed before they obtain a warrant; (3) the officers make reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and (4) the time period lasts no longer than reasonably necessary for the police to obtain a warrant.

*State v. Sullivan*, 2018 ME 37, ¶ 17, 181 A.3d 178 (citing *Illinois v. McArthur*, 531 U.S. 326, 331-33 (2001). Applying the *Sullivan* factors to this case, the Agents had probable cause to believe the home contained drugs. On July 9, Agent Carleton was informed that drugs and the alleged supplier, "Jeff", were at 32 Hennessey that day. The Agents then observed several known drug users on the premises, as well as pedestrians and vehicles coming and going for short durations. Agent Verrill testified that based on his experience, these quick visits were indicative of drug deals. And, in a post-*Miranda* interview, Hummel informed the Agents Boilard was at his house and that he brings

drugs and [Hummel] sells them. Based on the foregoing, is was reasonable to believe that drugs were still on the premises. As such, the Agents had probable cause to believe drugs would be found at 32 Hennessey.

Regarding the second prong of *Sullivan*, the Agents had reason to believe that evidence would be destroyed before they obtained a warrant. The Agents testified that the arranged buy at Shaws was not discreet. Similarly, the man who drove Hummel to Shaws was released after receiving a summons. He certainly had the opportunity to either return to 32 Hennessey or at the very least inform those present at 32 Hennessey about the drug bust. Given these possibilities, and based on their experience of being "burned" in the past, the Agents reasonably believed word of the arrest could get back to 32 Hennessey and that evidence could be destroyed prior to obtaining a search warrant.

As for *Sullivan's* third prong, the Agents made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy. This prong is satisfied primarily from the fact that the intrusion onto 32 Hennessey was only minimally invasive. The Agents made no attempt to enter the residence. They were simply on their way to locate and secure the apartment's rear window entrance.

Lastly, the Agents did not secure the premises for an unreasonable amount of time. There was only a brief window of time between when the Agents first had an opportunity to obtain a search warrant to when they abandoned their plan to obtain the warrant shortly after arresting Boilard.[15]

---

[15] Although it could be argued that the officers were never truly securing the premises in "anticipation" of a search warrant because one was never actually issued or sent for, "[i]t is not incumbent upon the law enforcement authorities to obtain a search warrant as soon as probable cause arises." *See State v. Dunlap*, 395 A.2d 821, 824 (Me. 1978).

Having determined that the Agents were lawfully on the premises to secure the residence in anticipation of a warrant, the Court finds it necessary to discuss an additional justification, namely, an officers implied invitation to approach a home. The implied invitation is articulated as follows:

> [T]he owner impliedly invites to intrude upon his or her property only those with a legitimate social or business purpose. *Id.* Moreover, the implied invitation extends only to recognized access routes reasonable under the circumstances, *id.* at 818-19; *Lorenzana v. Superior Court*, 9 Cal. 3d 626, 511 P.2d 33, 42, 108 Cal. Rptr. 585 (Cal. 1973), and to reasonable times of day, again depending on the circumstances, *Brown v. State*, 392 So.2d 280, 284 (Fla. App. 1980). As to someone present on the property under the implied invitation, the property owner has no reasonable expectation of privacy from observations made by that invitee. *Rand*, 430 A.2d at 819.

*State v. Cloutier*, 544 A.2d 1277, 1280 (Me. 1988). In this case, the Agents were conducting legitimate police business and entered through the side of the driveway, a route they observed others use to access the backyard that day. The Agents observed Boilard drop the black zippered pouch. There was no reasonable expectation of privacy from that observation. There is also "no expectation of privacy in a driveway that is completely and easily visible form a public street," meaning it does not fall within the home's curtilage. *See United States v. Roccio*, 981 F.2d 587, 591 (1ª Cir. 1992). Anyone from the public could observe or access the residence from the driveway. The residents of 32 Hennessey took no steps to discourage the public from entering through the driveway or observing the goings on at 32 Hennessey. The Agents approach to the backyard of 32 Hennessey was in keeping with the normal route of access to Hummel's residence. Hummel stated in the interview that his apartment entrance was through a window located in the rear of the building. The Agents were simply approaching Hummel's primary entrance.

Accordingly, even if the Court did find the search took take place in the curtilage of 32 Hennessey, there was no Fourth Amendment violation because the Agents were lawfully on the premises, either to secure the premises, or under their implied invitation.

## IV. Probable Cause and the Search Incident to Arrest Doctrine

### A. Probable Cause

Defendant argues that the Agents lacked probable cause to arrest Boilard and seeks to suppress the evidence on that ground. To that end "[t]he standards to support probable cause to arrest are well established." *State v. Journet*, 2018 ME 114, ¶ 15, 191 A.3d 1181. "Probable cause exists where facts and circumstances of which the arresting officer has reasonably trustworthy information would warrant an ordinarily prudent and cautious police officer to believe the subject did commit or was committing a crime. *State v. Boylan*, 655 A.2d 1016, 1019 (Me. 1995).

In this case, the Agents relied on information from the SOI, information gathered from their own observations, and the interview with Hummel. Taken together, the Agents had sufficient information to support their probable cause determination. Agent Carleton received information from a SOI on July 5, who personally observed Hummel selling drugs out of 32 Hennessey with a man named "Jeff," who the SOI believed to be Hummel's supplier.[16] The SOI notified Agent Carleton that "Jeff," the alleged supplier, would be returning soon with more drugs, and on July 8, "Jeff" did in fact return with more drugs. On July 9, after receiving this information from the SOI, Agents Carleton and Verrill conducted their own surveillance at 32 Hennessey. Based on their observations and experience, the Agents reasonably inferred that drugs were being sold out of 32 Hennessey. Agent Carleton also confirmed the presence of a man matching the,

---

[16] One can infer that the SOI was at 32 Hennessey to purchase drugs.

admittedly vague, description of "Jeff." Additionally, the Agents did not rely solely on the SOI and their own observations. It was later confirmed by Hummel that "Jeff" was in fact Jeffrey Boilard, who brought drugs that Hummel would sell.

### B. *Application of the Search Incident to Arrest Exception*

Having concluded that the search did not occur in a constitutionally protected area, the Agents lawfully entered 32 Hennessey to attempt to contact the Defendant and secure the premises in anticipation of a warrant. Once Agent Carleton identified the man sitting by the bench as Boilard and observed him drop the black zippered pouch, Agent Carleton seized Boilard and subsequently conducted a lawful search incident to arrest.

The search incident to a lawful arrest doctrine is an exception to the warrant requirement. The exception arose out of the concern that incident to a lawful arrest, the arrestee could gain access to dangerous weapons or destructible evidence. *See Chimel v. California*, 395 U.S. 752, 763 (1963). However, this authority is not absolute. For the search to be proper, officers must first establish that they had probable cause at the outset of the search. *State v. Le Blanc*, 347 A.2d 590, 593, 594 (Me. 1975). Although the arrest can come after the search, the search must be "sufficiently contemporaneous with the arrest that both together constituted a single incident." *Id.* With these conditions satisfied, "incident to a lawful arrest, police may, without a warrant, search an arrestee's person and items immediately associated with the person, and seize weapons, items of contraband, or evidence of a crime found in the search. *State v. Pagnani*, 2018 ME 129, ¶ 19, 193 A.3d 823 (citing *Riley v. California*, 573 U.S. 373, 381-86 (2014)).

Regarding the scope of the search, officers can search the area within the arrestee's "immediate physical control," which has been interpreted by the Law Court as the area within the arrestee's "conceivable control." *Le Blanc*, 347 A.2d at 595. Furthermore, even if items are not within the arrestee's "conceivable control," officers may still lawfully

search items that were "associated" with the arrestee's person at the time of the arrest or when they were told they were under arrest. *Id.* ¶ 24.

In this case, Boilard was handcuffed and in the presence of another officer at the time Agent Carleton searched the black zippered pouch. The search was contemporaneous with the arrest. Although the black zippered pouch may not have been within Boilard's "conceivable control," it likely remained "associated" with his person. *Id.* (a search of defendant's jacket was lawful even though "[defendant] removed the jacket before being handcuffed, she had been told she was under arrest before she removed the jacket, and the jacket, though she was no longer wearing it, remained associated with her person."). Moreover, even if the circumstances of this search do not fit squarely into either category, the Court may consider whether the application of the search incident to arrest doctrine would "untether the rule from the justifications underlying the *Chimel* exception." *Id.* ¶ 21. With that directive in mind, Agent Carleton's search of the black zippered pouch would not "untether the rule from the justifications underlying the *Chimel* exception."

## III. Conclusion

For the foregoing reasons, defendant's Motion to Suppress is DENIED.


The Clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: ___9/24/19___

MaryGay Kennedy, Justice
Maine Superior Court

Entered on the Docket: 9·24·19